# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

**FILED**

JUN 1 6 2008

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

DEPUTY CLERK

| | | |
|---|---|---|
| WILLIAM R. LAMBERT and | § | |
| LUCILLE H. LAMBERT, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. SA-08-CA-0134-FB |
| | § | |
| JOEL E. MEEK; | § | |
| RANDALL R. STUTTS; | § | |
| STERLING TRUST COMPANY; | § | |
| ROBERT BARNETT, | § | |
| | § | |
| Defendants | § | **JURY TRIAL DEMANDED** |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, WILLIAM R. LAMBERT and LUCILLE H. LAMBERT ("Plaintiffs" or "the Lamberts") and file this First Amended Complaint against JOEL E. MEEK ("Meek"), RANDALL R. STUTTS ("Stutts"), STERLING TRUST COMPANY, and ROBERT BARNETT ("Barnett") (collectively "Defendants") and for causes of action would respectively show the Court as follows:

### Attached Exhibits

Exhibit 1    Survey of Lake Ranch Property

Exhibit 2    Agreement dated February 14, 2006

Exhibit 3    Excerpts of Robert Barnett testimony

### I.
### The Parties

1.    Plaintiffs, **WILLIAM R. LAMBERT and LUCILLE H. LAMBERT**, are both citizens of the State of Florida.

2.     Defendant **JOEL E. MEEK** is a citizen of the State of Texas and has appeared in this lawsuit through his attorney of record.

3.     Defendant **RANDALL R. STUTTS** is a citizen of the State of Texas and has appeared in this lawsuit through his attorney of record.

4.     Defendant **STERLING TRUST COMPANY** is incorporated in the State of Texas and has its principal place of business in the State of Texas. Sterling Trust Company has appeared in this lawsuit through its attorney of record.

5.     Defendant **ROBERT BARNETT** is an individual who is a citizen of the State of Texas. Defendant Barnett can be served at his place of business at 333 Convent Street, San Antonio, TX 78205.

## II.
### Jurisdiction and Venue

6.     Subject matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds $75,000.00 (excluding interest and costs), and there is complete diversity of citizenship. The Court has jurisdiction over the lawsuit, because all of the Plaintiffs and all of the Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction of any remaining claims set forth herein pursuant to 28 U.S.C. § 1367 as these claims for relief arise out of a common nucleus of operative facts and form part of the same case or controversy.

7.     Venue for all causes of action stated herein pursuant to 28 U.S.C. § 1391(a)(2) lies in the Western District of Texas in that a substantial part of the events or omissions giving rise to the claim occurred in the Western District of Texas, San Antonio Division.

### III.

## Facts

8.      Plaintiffs, William R. Lambert and Lucille H. Lambert, are husband and wife. At all relevant times, William R. Lambert acted as the agent and representative for his wife. The Lamberts requested and authorized Kenneth Hyatt to inquire about a property in Mexico for potential purchase.

9.      Defendant Joel Meek is a Texas licensed real estate broker. Meek advertises himself and his business, Meek Ranch Sales, as experts in the field of ranch sales. Meek brokers sales of ranches in South Texas, New Mexico, and Mexico. Meek also offers ranch market analysis, listing services, ranch location services, and ranch management.

10.     Defendant Meek advertised for sale a property in Mexico known as "Lake Ranch."

11.     In or about January or early February 2006, Kenneth Hyatt, acting as the authorized agent and representative of the Lamberts, contacted Defendant Meek to inquire about the Lake Ranch Property. Defendant Meek arranged for Hyatt to meet and discuss a potential purchase. At that time, Meek represented to Hyatt that Lake Ranch included 6,000 acres of land located in the Municipality of Guererro, Coahuila, Mexico. According to Meek, the Lake Ranch Property also included a lodge ("Lake Ranch Lodge" or the "Lodge") and Mexican government concessions granting rights to consumptive and riparian use of the adjacent lake. Meek advised Hyatt that Meek himself was a 10% owner of Lake Ranch and that Meek was acting as the agent and broker for the other owners of Lake Ranch. Meek confirmed to Hyatt that the Lake Ranch Property included the Lake Ranch Lodge and 6,000 acres of land.

12.     After the meeting, Hyatt and Meek made arrangements for Plaintiff William Lambert to travel to Mexico to view the Lake Ranch Property and meet with Jose Pina, an

employee and representative of Meek. While in Mexico, Plaintiff William Lambert met Jose Pina. Jose Pina represented to William Lambert that Pina was the agent and employee of Meek and the owners of the Lake Ranch Property and that Pina was authorized to show the Lake Ranch Property on behalf of Meek and the other owners, including Defendants Randall Stutts and Sterling Trust Company.

13. Pina also represented to Plaintiff William Lambert that the Lake Ranch Property acreage consisted of 5,404.83 acres. Pina also provided Plaintiff William Lambert with a survey of the Lake Ranch Property. *A true and correct copy of said survey is attached hereto as Exhibit 1.*

14. Pina also showed Plaintiff William Lambert the Lake Ranch Lodge, which included a very large, fully furnished modern lakefront home with various buildings, including a guest house, equipment barn, caretaker house, and all tangible personal property in the main Lodge, including: furniture, appliances, tractors, guns, gun safe, tractor implements, deer feeders, ranch truck, trailer and three boats located in the barn.

15. Pina also showed Plaintiff William Lambert the entire Lake Ranch Property, including the various corners and dimensions of the property.

16. Pina further represented that the owners of the Lake Ranch Property enjoyed a riparian concession (easement) from the Mexican government that afforded full rights and access to the Lake Ranch Property for use and access to the adjacent "La Fragua" lake and reservoir.

17. After viewing the Lake Ranch Property and talking with Pina, Hyatt contacted Defendant Meek to discuss a possible purchase by the Lamberts. Defendant Meek, again representing himself to be an owner of the Lake Ranch Property and the authorized agent for the

other owners and broker, confirmed to Hyatt that what Pina had told Lambert was correct, with the exception of the property acreage.

18. Defendant Meek told Hyatt that the actual acreage of the Lake Ranch Property was 5,303 acres. Meek indicated to Hyatt that the owners would accept $2,300,000 for the Lake Ranch Property and Lodge.

19. On or about February 14, 2006, Defendant Meek drafted a sale agreement that memorialized the purchase price of $2,300,000 for 5,303 acres with the closing date to be February 20, 2006. The agreement called for the deposit of $100,000 in earnest money with Defendant Meek. *A true and correct copy of said agreement is attached hereto as Exhibit 2.* Meek submitted the agreement to Hyatt for the Lamberts' approval.

20. The agreement also confirmed that the Lamberts would be receiving the Lake Ranch Lodge with all of the furnishings and the other buildings on the Property, and all of the other personal property, including the boats, guns, tools, deer feeders, trailer, and ranch truck.

21. The agreement was signed by Joel Meek, as representative for the sellers, and Kenneth Hyatt, as representative for the Lamberts.

22. In reliance on Defendant Meek's representations and Pina's representations, Plaintiffs delivered a check in the amount of $100,000 in earnest money to Meek, at Meek's request.

23. Because of Mexican government regulations, the Lake Ranch Property is owned by a Mexican corporation named Immobiliaria STRI, S. de R.I. de C.V ("Immobiliaria"). South Texas Retirement Investments I, LLC and South Texas Retirement Investments II, LLC were represented by the sellers to own Immobiliaria. South Texas Retirement Investments I and II, LLC are Texas limited liability companies. Therefore, to accomplish the sale of the Lake Ranch

Property to the Plaintiffs, the sellers would be, among other things, assigning all membership interest and shares of South Texas Retirement Investments I and II, LLC to the Lamberts.

24.     Upon information and belief, South Texas Retirement Investments I and II, LLC were at all material times, owned by Defendant Stutts, Sterling Trust Company, and Meek. Defendant Meek signed the Membership Interest Purchase Agreements to assign the shares and membership interests to Plaintiffs.

25.     Robert Barnett ("Barnett") is a licensed Texas attorney practicing law in San Antonio, Texas. Barnett acted as the attorney for South Texas Retirement Investments I and II, LLC. Barnett also acted as the registered agent for the Texas companies and held a power of attorney for the Mexican corporation. At all relevant times, the companies' registered agent address with the Texas Secretary of State was listed as Barnett's law office.

26.     Barnett handled the closing and presented documents directly to Lambert at the closing in Texas. Prior to closing, Barnett also represented that he would continue as the attorney for the Texas companies after the sale took place, because Barnett was skilled and experienced in handling Mexican corporations and Mexican land transactions.

27.     On February 22, 2006, the closing took place. Barnett acted on behalf of both parties at closing. The Membership Interest Purchase Agreements provided that each party would pay their own legal fees and costs associated with the transaction. Barnett charged and was paid by the Plaintiffs to complete the transaction. Barnett worked in conjunction with the Plaintiffs' attorney in Florida, Allen Scott, to complete the transaction.

28.     The closing called for the sale of all of the outstanding shares and membership interest in South Texas Retirement Investments I and II, LLC to the Lamberts, assuring the

Lamberts ownership and control of the companies' Mexican owned subsidiary, Immobiliaria STRI, S. de R.I. de C.V.

29.     In reliance on the representations of Meek, Pina, and Barnett, the Lamberts entered into agreements to purchase the membership interests, in order to obtain ownership of the Lake Ranch Property and Lodge for $2,300,000.

30.     After the closing, the Lamberts began to ascertain the true facts, which were fraudulently concealed and misrepresented by Defendants.

31.     The Lamberts found out that the Lake Ranch Property owned by Immobiliaria actually consisted of only 4,467.62 acres or less.

32.     The Lamberts discovered that at least 622.78 acres of the property represented by the Defendants to be part of the Lake Ranch Property being sold was in fact titled to an adjacent property owner as part of a property entitled "Rancho Paso de Las Mulas." Therefore, the actual Lake Ranch Property acreage owned by Immobiliaria is actually 4,467.62 or less as opposed to the 5,300 acres, as represented by Defendants.

33.     The Defendants were all aware prior to closing that a portion of the Rancho Paso De Las Mulas property (622.78 acres) was the subject of a dispute between Immobiliaria and the owner of the Rancho Paso De Las Mulas. The Defendants were aware of the dispute, because Defendants had actually sold the Rancho Paso De Las Mulas property to Arthur Stark, Jr. and his son, Arthur Stark, III. The Defendants failed to disclose this dispute to the Lamberts, in violation of the agreements with the Lamberts and with fraudulent intent. The Defendants falsely represented in the Agreements that there were no problems or controversy related to Lake Ranch.

34.     After closing, the Lamberts learned that the Defendants were not only aware of a controversy about the property, but had had actually earlier approached Arthur Stark, III to

inform him that he had supposedly acquired roughly 600 acres too much in his purchase of Rancho Paso De Las Mulas. The Defendants demanded that Mr. Stark, III "deed back" to Defendants the 600 acres. Prior to the sale to the Lamberts, Mr. Stark, III refused to "deed back" the 600 acres and told both Meek and Barnett that he would not agree to deed back the 600 acres in dispute.

35. Prior to the sale to the Lamberts, Defendant Barnett was well aware of the dispute regarding the acreage and survey, because Barnett had also acted as the attorney for both the Starks and Joel Meek in the sale of the Rancho Paso De Las Mulas to the Starks. Barnett did not disclose to the Lamberts that he had represented both the Starks and Meek in the prior transaction, and Barnett participated with the other Defendants in fraudulently concealing and misrepresenting the ongoing boundary dispute to the Lamberts.

36. Arthur Stark, III also spoke with Barnett, several times about the disputed 622 acres. Prior to the sale to the Lamberts, Barnett informed Stark, III that there was a "mistake in the survey."

37. Prior to the sale to the Lamberts, Stark, III told Barnett that he did not want to deed back any of the acres of the land he had purchased. Stark, III wanted to make sure that the acres in dispute did not get deeded back without his consent, which was never given. Stark, III has stated under oath that Barnett told Stark, III that he agreed with him that the 600 acres belonged to Stark, III and that something needed to be done between Meek and Stark, III to resolve the issue. Despite this ongoing dispute and controversy over the 600 acres, Barnett prepared the documents necessary to have the property sold by the Defendants to the Plaintiffs.

38. Barnett then drove from San Antonio to Eagle Pass, Texas to meet the Plaintiffs in order to have the Plaintiffs sign the necessary documents that Barnett had prepared. At the

time of the sale to the Lamberts, Barnett was aware of the disputes and that over 600 acres of the land represented as being sold to the Lamberts was actually claimed by the Starks. Barnett never disclosed to the Lamberts the ongoing disputes with the Starks about the boundary, survey, and over 600 acres of land. In fact, Barnett took affirmative actions to induce the Plaintiffs to close the deal, after he was aware that the Defendants were making false statements in the Agreements he drafted. Barnett has admitted under oath that he knew about the boundary dispute before the sale to the Lamberts took place. *See Exhibit 3, Excerpts of Barnett Testimony.* Barnett also knew that the Lamberts were relying on the false representations of Barnett and the other Defendants, about Lake Ranch and about the dispute (which was hidden). Barnett knowingly drafted the Agreements containing false statements, closed the transaction, and accepted payment for the land and his legal fees from the Lamberts, anyway. *See Exhibit 3, Excerpts of Barnett Testimony.*

39.     The Plaintiffs later discovered that the Lodge located on the Lake Ranch Property is not located on the Lake Ranch Property at all, as Defendants represented. In fact, the Lodge is located on Mexican government concession land that is not owned by the Defendants, Immobiliaria, or any of the companies sold to Plaintiffs. Furthermore, the Plaintiffs have incurred expenses of approximately $75,000.00 to date to obtain concession agreements with the Mexican government which allow the Plaintiffs to actually use the Lodge and the personal property located at the Lodge.

40.     The Defendants also failed to disclose that the concession was delinquent due to nonpayment of Mexican taxes as of the date of the closing.

41.   . The Defendants have also failed to execute and deliver resignations and cancel powers of attorney or otherwise assist in the assignment of interests in the Mexican corporation,

Immobiliaria, to Plaintiffs or the companies. Although the Plaintiffs have demanded that the Defendants do so, Defendants have refused, and this has caused other problems for Plaintiffs, including the inability to obtain proper hunting licenses.

42. When the Plaintiffs were told by people in the area that the Lodge was located on property that did not belong to them and found out about a potential property boundary issue, they confronted Barnett. Barnett represented numerous times that he would present a petition to correct the boundary lines, was working with a notary public in Mexico, and would obtain and file a clarification deed for the Plaintiffs that would resolve the discrepancies. However, Barnett failed to perform this work or obtain and file a clarification deed.

43. The Defendants failed to obtain proper paperwork clarifying the deed to the Lake Ranch Property or resolving the pre-existing (but fraudulently hidden and lied about) dispute related to the owner of the 622.78 acres of the Rancho Paso De Las Mulas property.

43. All conditions precedent have been performed or have occurred.

## IV.
## CAUSES OF ACTION

### Fraud; Meek, Stutts, Sterling Trust Company, and Barnett

44. Plaintiffs incorporate by reference paragraphs 1- 43 above.

45. In order to induce the Plaintiffs into entering into contracts to purchase the shares of South Texas Retirement Investments I and II, LLC (which would include ownership of Immobiliaria and Lake Ranch), Defendants and/or their agents made various misrepresentations and concealed material events and facts.

46. Defendants fraudulently and knowingly concealed the fact that there was an ongoing and unresolved boundary dispute related to Rancho Paso de Las Mulas and the Starks.

47. Defendants fraudulently and intentionally misrepresented the amount of acreage

owned by Immobiliaria in Lake Ranch. Defendants misrepresented, after the transaction, that they would correct the boundary problem through a clarification deed. Defendants failed to obtain the clarification deed.

48. Defendants also fraudulently and intentionally misrepresented the status of the water concessions, which would grant access to the adjacent lake. Defendants further misrepresented the location of the Lake Ranch Lodge and contents.

49. The statements were false, omitted material facts, and designed to mislead Plaintiffs. The representations were material. The representations were false at the time they were made.

50. Defendants and their representatives and agents knew that these representations were false and made these representations intentionally without any regard for their truth. Defendants intended that Plaintiffs rely on the false representations and concealment of material facts. Plaintiffs, in fact, relied upon the false statements to their detriment.

51. As the conduct of Defendants was fraudulent and committed with malicious intent, exemplary damages should be imposed on Defendants in an amount within the jurisdictional limits of the court.

**Statutory Fraud Under Tex. Bus. & Com. Code Section 27.01; Meek, Stutts, Sterling Trust Company, and Barnett**

52. Plaintiffs incorporate by reference paragraphs 1- 51 above.

53. As stated hereinabove, Defendants made false representations of material fact and concealed material facts from Plaintiffs. Plaintiffs relied upon the false statements of Defendants to their detriment. Defendants made the false representations and failed to disclose material facts for their benefit. Defendants made the false statements with the intent to induce Plaintiffs to

enter into the Agreements. Defendants' acts caused injury to Plaintiffs in an amount as yet undetermined due to Defendants' concealment and fraud. The transaction involved the sale of real estate and/or stock.

54. As the conduct of Defendants was fraudulent and committed with malicious intent, exemplary damages should be imposed on Defendants in an amount within the jurisdictional limits of the court.

## Civil Conspiracy; Meek, Stutts, Sterling Trust Company, and Barnett

55. Plaintiffs incorporate by reference paragraphs 1- 54 above.

56. Defendants agreed to defraud Plaintiffs. Defendants agreed to conceal from Plaintiffs facts, including facts related to the true acreage of the Lake Ranch Property and the dispute related to Rancho Paso de Las Mulas and Art Stark.

57. Defendants knew that the agreed acts would result in harm to Plaintiffs.

58. To accomplish the object of their agreement, Defendants made false statements and concealed material facts from Plaintiffs.

59. The Defendants' agreement to defraud Plaintiffs proximately caused injury to Plaintiffs. Plaintiffs seek damages within the jurisdictional limits of the court.

## Negligent Misrepresentation; Meek, Stutts, Sterling Trust Company, and Barnett

60. Plaintiffs incorporate by reference paragraphs 1- 59 above.

61. As stated hereinabove, Defendants made false representations of fact. The Defendants made the representations in the course of Defendants' business and in the course of a transaction in which Defendants had an interest. Defendants made the representations for the guidance of others.

62.     Defendants failed to use reasonable care in communicating the information.

63.     Defendants justifiably relied on Defendants' representations when Plaintiff purchased the Lake Ranch Property.

64.     Defendants' misrepresentations proximately caused injury to the Plaintiffs, which resulted in damages. Plaintiffs seek damages within the jurisdictional limits of the court.

**Breach of Contract; Stutts and Sterling Trust Company**

65.     Plaintiffs incorporate by reference paragraphs 1- 63 above.

66.     Plaintiffs affirm that agreements were entered into between the Plaintiffs and Defendant Stutts and Defendant Sterling Trust Company for the sale of the Lake Ranch Property and Lodge. The Defendants materially breached the agreements.

67.     Defendants have acknowledged said contract by requesting and accepting payment from Plaintiffs.

68.     Defendants have refused, and continue to refuse, to comply with their obligations under the contracts, including but not limited to: failure to deliver the Lake Ranch Property acreage in full with all personal property connected with it, failure to turn over all record books, corporate documents, and accounting records and documentation, as required by the agreements, failure to turn over all company records of Immobiliaria STRI, S. de R.L. de C.V., including all records and documents related to the tract of real property known as "Lake Ranch," and failing to apprise Plaintiffs of controversies related to the Lake Ranch Property and Rancho Paso de Las Mulas.

69.     As a direct and proximate result of the foregoing, Plaintiffs have suffered damages. Plaintiffs seek damages within the jurisdictional limits of the court.

**Quantum Meruit/Unjust Enrichment; Meek, Stutts, Sterling Trust Company, and Barnett**

70.     Plaintiffs incorporate by reference paragraphs 1- 69 above.

71.     If Defendants are allowed to retain the entire $2,300,000 purchase price (and all monies paid by the Plaintiffs for legal fees and/or closing costs), Defendants will be unjustly enriched.

## V.
### Attorneys' Fees

72.     Plaintiffs plead for attorneys' fees for prosecuting this suit, which Plaintiffs' counsel states is the sum of at least $100,000.00 should this matter require a trial in a court of law.  Plaintiffs affirm that they are entitled to recover reasonable and necessary attorneys' fees due to Defendants' breach of contract and due to Defendants' statutory fraud under Tex. Bus. & Comm. Code § 27.01.

### Prayer for Relief

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs pray that the Defendants be cited to appear and answer herein and that upon final hearing Plaintiffs have judgment against the Defendants for:

1.      Judgment against the Defendants, jointly and severally for the full amounts due, including interest and penalties allowable by law;

2.      Exemplary damages due to Defendants' conduct;

3.      Pre-judgment interest at the legal rate;

3.      Post-judgment interest at the legal rate;

4.      Judgment against the Defendants, jointly and severally, for reasonable and necessary attorneys' fees;

5.      All court costs associated with this suit;

6.      For such other and further relief at law or in equity as the court may deem prope

Respectfully submitted,

**Hulse ♦ Stucki, PLLC**


Jay R. Stucki
State Bar No. 00798531
2912 West Story Road
Irving, Texas 75038
Telephone:     (214) 441-3000
Fax:              (214) 441-300

Stan O. Hulse
State Bar No.  24004710
1017 N. Main, Suite 200
San Antonio, TX  78212
Telephone:     (210) 822-1707
Fax:              (210) 822-1315
**ATTORNEYS FOR PLAINTIFFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served in accordance with the Federal Rules of Civil Procedure on all attorneys of record, on this 4th day of ⎽June⎽, 2008.

Jay R. Studki



EXHIBIT

OCT-17-2007 09:19 From:                                  To:9144413001                    P.25/52

02/14/2006 15:51  83049  7          MEEK RANCH SALE              PAGE 01/03

1525-A CR 370                          (830) 486-0425 Phone
Uvalde, TX. 78801                      (830) 486-0497 Fax



## MEEK
### RANCH SALES

### FACSIMILE TRANSMITTAL SHEET

TO:
**Bill Lambert**

FROM:
**Joel Meek, Owner-Broker**

P.X. O'Neil, Agent

| | |
|---|---|
| COMPANY: | DATE: **2-14-06** |
| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: **2** |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: | YOUR REFERENCE NUMBER: |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY

NOTES/COMMENTS:

Bill;

Please call me if you need any help.

Joel Meek

Internet: www.meekranchsales.com   E-mail: joel@meekranchsales.com

IF YOU ENCOUNTER PROBLEMS WITH THIS TRANSMISSION, PLEASE CALL 830.486.0425

**EXHIBIT**
**2**


Lake Ranch Sale Agreement:

Buyer:            William & Lucille Lambert

Seller:           South Texas Retirement Investments I & II

Acreage:          Approximately 5,303 acres

Purchase Price:   $2,300,000

**Seller Obligations:**
Seller agrees to leave all items in house and on the ranch including but not limited to: furniture, appliances, tractors, guns, gun safe, tractor implements, deer feeders, ranch truck, 16' trailer, & 3 boats which are located in the barn at the time of this agreement. Seller will retain his personal clothing and fishing equipment.

**Buyer Obligations:**
Buyer will pay for the closing costs and recording fees involved with the sale.

**Closing Date:**
Monday, February 20th, 2006

**Earnest Money:**
As of the date of this agreement, Buyer has deposited an earnest money check in the amount of $100,000 with Joel Meek. Buyer and Seller agree, the earnest money check will given back to the Buyer at closing.

Seller _Aandig Stath's  88.5%_         _Joel Smith  6-14-06_  Seller  11.5%

_Kenneth Idgath  (Agent)_  Buyer

1

```
1                    REPORTER'S RECORD
                    VOLUME 1 OF 1 VOLUME
2            TRIAL COURT CAUSE NO. 2007-CI-12026

3    WILLIAM R. LAMBERT, ET AL    )   IN THE DISTRICT COURT
                                  )
4    vs.                          )
                                  )
5    JOEL E. MEEK, ET AL          )   BEXAR COUNTY, TEXAS
                                  )
6    vs.                          )
                                  )
7    ALLEN SCOTT                  )   224TH JUDICIAL DISTRICT

8

9

10        _____

11           **HEARING ON MOTION FOR SANCTIONS**

12        _____

13

14        On the 24th day of April, 2008, the following

15   proceedings came on to be heard in the above-entitled

16   and numbered cause before the Honorable Martha Tanner,

17   Judge Presiding, held in San Antonio, Bexar County,

18   Texas.

19        Proceedings reported by computerized stenotype

20   machine.

21

22

23

24

25
```

EXHIBIT
3

GLYN E. POAGE, CSR, RDR, CRR
166TH DISTRICT COURT   BEXAR COUNTY, TEXAS

1   documents, that there were some lingering powers of

2   attorney that needed to be changed on the Mexican

3   companies that actually -- excuse me -- on the Mexican

4   company that owns the property. But I don't recall ever

5   being the registered agent for the Texas LLCs.

6       Q.   And, in fact, as of the date of the

7   transaction, who now is the owner of the investment

8   companies? It's Mr. Lambert, isn't it?

9       A.   The owner of South Texas Retirement Investments

10  I and South Texas Retirement Investments II, LLC, two

11  Texas LLCs -- the sellers in this transaction, Sterling

12  Bank and Randy Stutts, sold their interest to Mr. and

13  Mrs. Lambert.

14      Q.   Okay. So there were more transactions after

15  the sale in which you represented the investments,

16  correct, companies?

17      A.   Not to my knowledge.

18      Q.   Well, the sale for both entities was $2,300 or

19  $2,300,000, correct?

20      A.   That sounds right, yes, sir.

21      Q.   And then the Lamberts also e-mailed to you

22  $3,500, correct?

23      A.   Yes, sir.

24      Q.   Okay. And then the Lamberts also mailed to

25  you, after that, $18,000, correct?

1     A.   I don't recall -- $18,000 for what?  I don't

2   remember that.

3               MR. STUCKI:  May I approach the witness,

4   Your Honor?

5               THE COURT:  Certainly.

6               (Handing to witness)

7     Q.   (BY MR. STUCKI) Does that help you recall, sir?

8     A.   I still don't recall what the 18,000 was for

9   exactly, but my best recollection is that they were all

10  pending legal fees, as the parties had agreed that the

11  buyer in the transaction would pay our law firm's legal

12  fees in the transaction for putting together all the

13  closing documents, which is a fairly standard procedure.

14  One of the parties agrees to pay the legal fees.  And

15  that's -- that would be the only thing that I would

16  recall that $18,000 being.

17    Q.   You're exactly correct, sir.

18               Would you please go to Exhibit C again of

19  the plaintiffs' --

20               MR. CURL:  Object to --

21               MR. STUCKI:  I'm sorry.

22               MR. CURL:  -- the sidebar, Your Honor.

23    Q.   (BY MR. STUCKI) Would you please turn to Page 4

24  of the Membership Interest Purchase Agreement, which is

25  Exhibit C?  And I'm going to read Section 11,

1  Number 1.

2      Q.  (BY MR. STUCKI) Did you write this e-mail, sir?

3      A.   Yes, sir.

4      Q.  Okay.  And you're saying that you've got to do

5  a new survey on both properties, correct?

6      A.   I'm not a surveyor, but my understanding is

7  that when Mr. Stark's 6,000 acres was surveyed off, in

8  the 2002 transaction when Mr. Stark bought part of the

9  property, the 11,300 acres, which is this --

10              MR. BOYLE:  Counsel, I don't think that's

11  been introduced as an exhibit in this proceeding.

12              THE WITNESS:  Okay.  I was just trying to

13  help the judge.

14              Mr. Stark bought 6,000 acres, no more, no

15  less.  His deed says 6,000 acres.

16              After Mr. Stark bought that property,

17  this -- the surveyors -- and, again, I'm not a surveyor,

18  but the surveyors said that of the 11,300 acres that was

19  there originally, that the line demarcating the

20  6,000 acres was not drawn in the correct place and that

21  it needed to be corrected.

22      Q.   And you knew about that problem prior to

23  February of '06, correct?

24      A.   I wouldn't necessarily call it a problem.  I

25  would call it -- because my understanding is that

1   Mr. Lambert claims that he did not receive 5,300 acres.

2                   The ranch is 11,300 acres.  Mr. Stark

3   bought 6,000 acres, which, again, I'm not a surveyor,

4   but -- and I didn't review any surveys prior to

5   Mr. Lambert's purchase of the property, but the

6   resulting amount of acreage there is 5,300 acres.

7                   MR. STUCKI:  Objection, nonresponsive.

8                   THE COURT:  Sustained.

9        Q.  (BY MR. STUCKI) Okay.  The question is very

10  basic.  You knew about this problem, however you want to

11  classify it, okay, as a clarification, an adjustment,

12  whatever your terms are.  But you knew about that prior

13  to February of 2006, correct?

14       A.   The surveyor had informed us that the line

15  needed to be clarified.

16       Q.   Okay.  And you did absolutely nothing to bring

17  that to the attention of Mr. Allen Scott or Mr. Lambert,

18  correct?

19       A.   I didn't represent them.

20                  MR. STUCKI:  Pass the witness.

21                  REDIRECT EXAMINATION

22  BY MR. BOYLE:

23       Q.   One quick question, sir.  And I keep on going

24  back to the same basic issue.  Did you ever at any time

25  represent Mr. or Mrs. Lambert in this proceeding?

1    A.    No.

2    Q.    In this transaction?

3    A.    No, sir.

4    Q.    Is there any justification for anyone writing

5 in a petition that you were their attorneys?

6    A.    Not in my opinion.

7    Q.    Okay.  And, sir, the fact that they may have

8 paid all or a portion of your bill as a result of the

9 transaction, is that something that's common in real

10 estate transactions?

11    A.    Yes.

12    Q.    Does it happen on a fairly regular basis?

13    A.    Yes.

14    Q.    Okay.  And did you ever have a fee engagement

15 letter with these folks?

16    A.    No.

17              MR. BOYLE:  That's all I have.  Thank you.

18                    RECROSS-EXAMINATION

19 BY MR. CURL:

20    Q.    Mr. Barnett, you're familiar with what a

21 registered agent is for a company; is that correct?

22    A.    Yes.

23    Q.    Does a registered agent have to be a lawyer?

24    A.    No.

25    Q.    Does a registered agent involve any type of

1    legal service to the company?

2        A.    Not to my knowledge.

3        Q.    What does a registered agent do?

4        A.    Serves as a contact person for the entity.

5                MR. CURL:  Pass the witness.

6                      RECROSS-EXAMINATION

7    BY MR. STUCKI:

8        Q.    I'm just confused.  You wrote the agreement and

9    you're saying that this agreement is clear, that under

10   this agreement you never represented all the parties or

11   certain parties or were changing seller's names.  What I

12   need to know -- Section 11, "Transaction Expenses," sir.

13   Tell me when you're there.

14              Does it not say, "seller and purchaser

15   shall each bear their own legal fees"?

16       A.    It does, but the parties agreed and you would,

17   I guess, have to -- I wasn't part of any of these

18   communications, but my understanding is that the parties

19   agreed that the legal fees that were incurred on behalf

20   of the sellers would be paid by the buyers.

21       Q.    So there are other agreements outside this

22   contract that effects this contract, correct?

23       A.    I don't know.  I wasn't a part of any of those

24   discussions.

25              MR. STUCKI:  No further questions.